## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **CLINT BOWERS,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 2:19-CV-2585-JAR** |
| **NETSMART TECHNOLOGIES, INC.,** | |
| **Defendant.** | |

## MEMORANDUM AND ORDER

Plaintiff Clint Bowers filed suit against his former employer, Defendant Netsmart Technologies, Inc. ("Netsmart"), alleging failure-to-accommodate, discrimination, and retaliation claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*., as amended.  Before the Court is Defendant's Motion for Summary Judgment (Doc. 31).  The motion is fully briefed, and the Court is prepared to rule.  For the reasons set forth in detail below, the Court grants the motion.

### I.    Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[1]  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2]  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the non-moving party."[3]  A fact is "material" if, under

---

[1] Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[2] *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[3] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[5]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[6]  Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[7]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[8]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[9]  To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript[,] or a specific exhibit incorporated therein."[10]  The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[11]

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"[12]

---

[4] *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5] *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[6] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

[7] *Anderson*, 477 U.S. at 256.

[8] *Id.*; accord *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[9] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671).

[10] *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).

[11] *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[12] *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## II.     Facts

The following facts are uncontroverted, stipulated to, or viewed in the light most favorable to Plaintiff as the nonmoving party.  Plaintiff's attempts to controvert stipulated facts from the Pretrial Order are unavailing.  The Pretrial Order, once entered, "controls the course of the action unless the court modifies it," and any modification should only be made "to prevent manifest injustice."[13]  One of the express purposes of the Pretrial Order is to "obtain[ ] admissions and stipulations about facts and documents to avoid unnecessary proof."[14]  Because Plaintiff neither moves to withdraw the stipulations, nor explains why they should not be binding on summary judgment, the Court finds that he is bound by the stipulations in the Pretrial Order.[15]

Plaintiff Clint Bowers was employed by Defendant Netsmart from 2016 until January 31, 2019, as a Solution Architect.  In his role as a Solution Architect, Plaintiff had access to sensitive client data, including electronic medical records.

Plaintiff is a Type 1 diabetic.  He told his immediate supervisor, Jon Spoonemore, of his diabetes, although he does not recall exactly when he told him this information.  Plaintiff testified at his deposition that his diabetes has not restricted him at all in terms of his daily activities, his ability to work, or his work product.

Plaintiff suffered a heart attack over the Thanksgiving holiday in 2018.  He notified Defendant of his heart attack on November 26, 2018, the Monday following Thanksgiving.

---

[13] Fed. R. Civ. P. 16(d)–(e).

[14] Fed. R. Civ. P. 16(c)(2)(C).

[15] *See Hullman v. Bd. of Trustees of Pratt Cmty. Coll.*, 950 F.2d 665, 668 (10th Cir. 1991) ("[I]ssues not preserved in the pretrial order have been eliminated from the action, and a party who did not so preserve an issue may not use it in resisting a motion for summary judgment."); *In re Durability, Inc. v. Sovereign Life Ins. Co.*, 212 F.3d 551, 556 (10th Cir. 2000) (holding that, pursuant to Fed. R. Civ. P. 36, a non-moving party may be relieved of a stipulation of fact made during discovery if the Pretrial Order had not yet been entered and discovery has not yet been completed at the time the opposing party moved for summary judgment); *see also Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1188 (10th Cir. 2018) (discussing the contractual nature of stipulations in general and noting that the district court has discretion to decide whether to enforce them).

When Defendant became aware of Plaintiff's heart attack, it offered him the opportunity to work from home, but Plaintiff rejected the offer.  Defendant's Director of Human Resource, Cari Stammler, emailed Plaintiff when he returned to work to make sure he was okay.  Plaintiff responded that he was "ok.  Was in the hospital for a couple of days but they released me on Friday.  I will bring in a release to work tomorrow so you have it for the records.  I am on light duty no lifting over 25 lbs. for a couple of weeks and just have to watch fatigue this week."[16]  The light duty restriction did not affect Plaintiff's work and had little impact on his daily living, aside from a home construction project.

Plaintiff's doctor provided a work release to Defendant stating that Plaintiff could work as tolerated starting November 26, 2018, and that he could resume full-duty work on December 3, 2018.  Plaintiff did not articulate any request to Defendant for accommodation following his heart attack.

On December 6, 2018, Plaintiff suffered an episode of irregular heartbeat related to his heart condition while he was at work and was transported to the hospital.  On December 7, 2018, Plaintiff emailed his team at Netsmart to inform them that he was working from the hospital.  Spoonemore responded that Plaintiff should not be working from the hospital and should rest.  Stammler also called Plaintiff in the hospital to assure him that he should not be performing any work.  She requested that Plaintiff provide a medical note clearing him to work before returning.

On December 10, 2018, Plaintiff returned to work with a medical release; there were no work restrictions.  Plaintiff met with Stammler to discuss his workload, and she told him to "take it easy,"[17] but Plaintiff never sought an accommodation for his December 6th medical situation.

---

[16] Doc. 33-1 at 35 (Ex. 1).

[17] *Id.* at 90:12–91:8.

Plaintiff was capable of performing the essential functions of his position despite his heart condition.  Plaintiff testified at deposition that his heart condition only required him to exercise, eat right, take his medication, and try to keep his stress levels down—"just stuff that people should be doing every day."[18]

### 2019 Salary Increase

On January 2, 2019, Plaintiff emailed Spoonemore about a 4% merit increase to his salary he received on January 1; he believed it should have been higher to better reflect the market.  Plaintiff told Spoonemore and his indirect supervisor, Tom Geis, that he was dissatisfied with his salary and believed he deserved a 20% salary increase.  He told Geis that he had other job opportunities lined up and would need that 20% increase in order to stay with Defendant.  Plaintiff reiterated his salary concerns in a meeting with Stammler.  Stammler requested that Plaintiff provide information supporting his position that he was paid below market, but Plaintiff never provided the market information requested.

Plaintiff communicated to Defendant multiple times, including through emails, that he intended to leave Netsmart.  On January 10, 2019, Plaintiff sent an email to Todd Churchill, another indirect supervisor, indicating that he intended to look for employment outside Netsmart.  On January 11, 2019, Plaintiff sent an email to Spoonemore and Geis, in which he stated that he would start to look for employment outside Netsmart.  On January 17, 2019, Plaintiff sent an email to Spoonemore, reminding Spoonemore that he had started looking "for some place else to go."[19]  Although he had "put it on hold for a little bit" in order to finish a project, he wrote to

---

[18] *Id.* at 58:13–19.

[19] Doc. 33-1 at 51 (Ex. 8).

Spoonemore: "I thought I should remind you more of a peer than anything as I will do my best to document everything and get stuff ready for turn over."[20]

Spoonemore told Stammler that Plaintiff's dissatisfaction with his employment was interfering with team cohesiveness and the work environment.[21]  Moreover, Geis had concerns about Plaintiff's assertion that he intended to leave if he was not provided a higher salary given his access to sensitive and confidential client information.

Plaintiff spoke to Spoonemore sometime after January 20, 2019, when he began taking a new sleep medication.  Plaintiff apologized for what he characterized as "aggressive" and "combative" behavior toward his coworkers for the past month that he attributed to either a lack of sleep or a previous sleep medication.[22]  Plaintiff did not specifically tell Spoonemore that he was taking sleep medication because of his combative and aggressive behavior.  Plaintiff tried to set up a meeting with Stammler and Geis to discuss his medication and prior behavior, but Stammler canceled the meeting and asked if they could speak by phone.  Plaintiff declined, stating that it could wait; he wanted to speak to her about the issue face-to-face.

### *Plaintiff's Employment Separation*

Plaintiff's employment with Defendant ended on January 31, 2019.  Defendant determined it was in Plaintiff's and Defendant's best interest to separate based on Plaintiff's communications about being dissatisfied with his salary and his intent to find employment elsewhere.  On January 30, 2019, Plaintiff was called to a meeting with Stammler, Geis, and Spoonemore, during which he was informed of his immediate separation.  Prior to the meeting,

---

[20] *Id.*

[21] Plaintiff's hearsay objection to this testimony is overruled.  Defendant offers it not for the truth of the matter asserted, but instead, to demonstrate that Spoonemore relayed this information to Human Resources.  *See* Fed. R Evid. 801(c).

[22] Doc. 33-1 at 137:10–144:14.

Geis prepared a "script" that he sent to Cari Stammler that he "would like to follow for the meeting," that would precede Stammler's recitation of the separation process.[23]  The proposed language stated:

> You recently shared your intention to discontinue employment at Netsmart through both written and verbal declarations to: your immediate manager, your front-line executive, the Netsmart Plexus Cloud - Senior Vice President, and Human Resources advocate. Your statements lacked a clear date but stated you were looking for other employment and indicated a timeframe of weeks vs. months. Due to the level of access required for the role you hold within Netsmart Plexus Cloud, it is in the best interest of Netsmart and our clients to facilitate your stated intentions, immediately.  This response from Netsmart serves as an acknowledgement of your declarations and provides a mutually agreeable separation plan.[24]

Geis also proposed "optional" language to be read if Plaintiff recanted his intention to leave his employment.  This optional section discussed Plaintiff's shortcomings as to two of Defendant's core values: "Values Results vs. Just Effort," and "Is a Leader and a Teacher."[25]  At the meeting, Plaintiff did not retract his intent to find employment elsewhere.  He was escorted out of the building by Geis; Spoonemore boxed up Plaintiff's personal items.  He was paid through April 1, 2019.

On March 19, 2019, Plaintiff filed a Charge of Discrimination against Defendant with the United States Equal Employment Opportunity Commission ("EEOC").

### Applications for Reemployment

On June 13, 2019, Plaintiff reapplied for a Solution Architect—Hosting position with Defendant.  This position was reposted on multiple occasions between June and August 2019. At the time he applied, Plaintiff was employed by Insight Global, where he was earning a higher

---

[23] Doc. 38-3 at 5 (Ex. 12).

[24] *Id.*

[25] *Id.*

rate of pay than he did when he last worked for Defendant.  Plaintiff was declined for this Solution Architect position on August 22, 2019.  The Netsmart recruiter assigned to fill this position worked with the hiring manager, Spoonemore, to make a hiring decision.  They decided that an internal candidate would be hired to fill the position.  Once this decision was made, consideration was not given to external candidates such as Plaintiff.  It is possible that Spoonemore would have known that Plaintiff applied for the position, but it would depend on when the internal candidate was selected.  Once that selection was made, Spoonemore would not have reviewed any other resumes.[26]

On August 17, 2019, Plaintiff applied for a different Solution Architect position with Defendant.  Plaintiff was declined for this position on October 23, 2019.  A different recruiter was assigned to fill this position; Jason Mendez was the hiring manager.  Defendant hired an external candidate, Kimberly Willis.  On Plaintiff's file, the recruiter noted that Plaintiff was not selected because he was not qualified for the position.  Willis was more qualified than Plaintiff because she had implementation experience, client-facing experience, financial experience, and long-term care experience.  While Willis had both the required financial and consulting experience (and even owned her own consulting practice at the time she was hired by Netsmart), Plaintiff had neither.  Neither recruiter assigned to fill these two positions had ever worked with Plaintiff when he was previously employed by Defendant; neither was involved in his separation. Neither recruiter was aware of Plaintiff's charge of discrimination.

Plaintiff continues to be eligible for rehire by Defendant.

---

[26] Plaintiff's hearsay objections to Wendy Hill's testimony about the details of the application process are overruled.  Hill testified as a Fed. R. Civ. P. 30(b)(6) witness about the process for filling these positions.  She therefore testified "'vicariously,' for the corporation, as to its knowledge and perceptions." *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 434 (5th Cir. 2006).  By definition, such a witness is required to testify about matters that go beyond those with which she was personally involved. *Id.* at 433. Moreover, Plaintiff fails to identify any "statement" made by a "declarant" in Hill's testimony that should be excluded under Rule 801(b) and (c).

## III.    Discussion

Plaintiff raises three types of claims under the ADA, alleging that Defendant: (1) failed to accommodate his disability; (2) discriminated against him because of his disability; and (3) retaliated against him for requesting an accommodation and/or for filing a charge of discrimination.  He alleges separate discrimination and retaliation claims based on termination and failure to rehire.[27]  The Court first addresses the failure-to-accommodate claim, and then separately considers Plaintiff's discrimination and retaliation claims.

### A.    Failure to Accommodate

Count II alleges that Defendant failed to reasonably accommodate Plaintiff's disability in violation of the ADA.  Under the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."[28]  The term "discriminate against a qualified individual on the basis of disability" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]."[29]

---

[27] The parties are directed to review Rule 16, as they both address in their summary judgment papers the claims as articulated in the Amended Complaint, which includes five counts, rather than the governing Pretrial Order, which sets forth four legal theories of relief.  *See Zenith Petroleum Corp. v. Steerman*, 656 F. App'x 885, 888 (10th Cir. 2016) (citing *Tyler v. City of Manhattan*, 118 F.3d 1400, 1403 (10th Cir. 1997)) ("It is the pretrial order, and not the complaint, that defines the scope of litigation.").  Because both sides presume that the five separate claims alleged in the Amended Complaint control, the Court addresses all five in its ruling.

[28] 42 U.S.C. § 12112(a).

[29] *Id.* § 12112(b)(5)(A).

This type of ADA claim does not require evidence of discriminatory intent.[30]  Thus, a

failure-to-accommodate claim is evaluated under a modified *McDonnell Douglas* burden-shifting

framework.[31]  Under this framework, Plaintiff must first demonstrate a prima facie case

comprising four elements: (1) he is disabled; (2) he was otherwise qualified; (3) he requested a

plausibly reasonable accommodation; and (4) Defendant refused to accommodate his disability.[32]

Plaintiff's burden to establish a prima facie case is not "onerous."[33]  If Plaintiff establishes a

prima facie case of failure to accommodate, the burden shifts to Defendant to "to present

evidence either (1) conclusively rebutting one or more elements of plaintiff's prima facie case or

(2) establishing an affirmative defense, such as undue hardship or one of the other affirmative

defenses available to the employer."[34]  The Tenth Circuit has explained:

> If the employer does either of the above, summary judgment will
> be appropriate for the employer unless the employee then presents
> evidence establishing a genuine dispute regarding the affirmative
> defenses and/or rehabilitates any challenged elements of . . . her
> prima face case sufficiently to establish at least a genuine dispute
> of material fact as to such challenged elements.[35]

To meet the third prong of the prima facie case, Plaintiff has to show that he requested a

plausibly reasonable accommodation.  "An employer cannot be liable for failing to accommodate

a disability if it is unaware of the need for an accommodation."[36]  It is the request for

---

[30] *Punt v. Kelly Servs.*, 862 F.3d 1040, 1048 (10th Cir. 2017).

[31] *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1204 (10th Cir. 2018) (citing *Punt*, 862 F.3d at 1049–50).

[32] *Aubrey v. Koppes*, 975 F.3d 995, 1005 (10th Cir. 2020) (citations omitted).

[33] *Id.* (citing *Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1266 (10th Cir. 2015)).

[34] *Id.* (quoting *Lincoln*, 900 F.3d at 1204).

[35] *Id.* (quoting *Punt*, 862 F.3d at 1050).

[36] *Id.* at 1006 (citing *Punt*, 862 F.3d at 1048).

accommodation that triggers the employer's duty to engage in an interactive process for determining whether such accommodations would enable the employee to return to work.[37]

The Court agrees with Defendant that Plaintiff cannot demonstrate a prima facie case of failure to accommodate because there is no dispute that he never requested an accommodation for either his diabetes or his heart condition. The parties stipulated that Plaintiff never requested an accommodation following his heart attack.[38] And it is uncontroverted that Plaintiff never requested an accommodation for his diabetes, nor sought an accommodation for his December 6th medical situation.[39] Because Plaintiff never requested any accommodations for these conditions, he is unable to establish a prima facie case.

The Court is not persuaded by Plaintiff's attempts to controvert these undisputed facts. He points to his deposition testimony that he told Defendant about the effects and consequences of his sleep medication that was prescribed due to his heart condition. But Plaintiff does not direct the Court to any evidence that he requested an accommodation for those issues. Nor does Plaintiff offer any authority that supports the proposition that his statements sufficed to place Defendant on notice that he was requesting an accommodation.[40]

Plaintiff also points to a statement in Geis' deposition testimony that, in making the decision to separate Plaintiff's employment, he considered whether Defendant could "accommodate" him. It is clear from the context of this testimony that Geis was not speaking about accommodating Plaintiff's medical conditions. Instead, he was discussing whether, in the

---

[37] *Id.* at 1007 (citations omitted).

[38] Doc. 29 at 2 ¶ 7.

[39] Doc. 37 at 13 ¶ 38, and 16 ¶ 50.

[40] *See Punt*, 862 F.3d at 1048 ("The employer must of course know of the employee's disability *and* of the accommodation the employee wishes to receive in order to have any responsibility for providing such an accommodation." (emphasis added)).

context of Plaintiff's demand for a higher salary increase, Defendant could accommodate him in a way that allowed him to stay employed.  The testimony leading up to the passage relied on by Plaintiff discussed at length Plaintiff's request for a 20% increase in salary and Geis' offer to work with Plaintiff to get him to that point by putting a plan together.  Geis "clarified a little bit of here's the gap between where you're looking at and how do you get 20 percent, and, you know, quickly things that you would have to go do, and he just did not seem interested in that."[41] Counsel later asked Geis about his decision to "facilitate [Plaintiff's] exit," after receiving another communication from Plaintiff on January 11, 2019, that he was planning to leave Netsmart:

> So after we had the discussion where he came into my office asking for the 20 percent or was leaving, and that matter, you know, concluded, I thought . . . he continued to share that he was leaving.  That he was wrapping things up. . . .  And I remember talking with Jon on several occasions of, well, you know, what is—is there something we need to do?  Is he asking for us to help accommodate somewhere or what do we need to do to help him be successful in his projects?  And, you know, Jon was confused as well. The one part was clear is that Jon kept communicating that he was leaving Netsmart.  So I recall at some point after that meeting, I think it was a few weeks of just having these persistent messages and communications and Jon telling me that Clint continues to tell him that he's leaving Netsmart I know I had the responsibility—I remember having the realization that, okay, I've got an associate here who has came in and told me—really when he demanded 20 percent, that was his verbal notice that he was leaving Netsmart.  I was working to accommodate him to make sure that he had a clear path to stay here, and I really thought that he was going to choose that path but he continued to persist that he was leaving Netsmart.[42]

Viewing this testimony in the light most favorable to Plaintiff, the Court cannot draw the reasonable inference that Plaintiff requested an accommodation for his alleged disabilities.  To

---

[41] Doc. 33-3 at 43:2–9.

[42] *Id.* at 47:14–49:3.

suggest otherwise misreads the cited testimony.  Thus, the Court grants summary judgment on Plaintiff's failure-to-accommodate claim alleged in Count II.

### B.   Discrimination

Counts I and IV allege disability discrimination.  Count I alleges that Defendant terminated Plaintiff because of his disability; Count IV alleges that Defendant failed to rehire Plaintiff because of his disability.  Because Plaintiff does not rely on direct evidence of discrimination, the Court considers his claims under the familiar burden-shifting analysis set forth in *McDonnell Douglas v. Green*.[43]

Under *McDonnell Douglas*, the plaintiff initially bears the burden of production to establish a prima facie case of discrimination.[44]  The burden of establishing the prima facie case is "not onerous."[45]  If plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a facially nondiscriminatory reason for its actions.[46]  If defendant articulates a legitimate nondiscriminatory reason, the burden shifts back to plaintiff to present evidence from which a jury might conclude that defendant's proffered reason is pretextual, that is, "unworthy of belief."[47]

### 1.   Prima Facie Case

To establish a prima facie case of discrimination under the ADA, Plaintiff must show: "(1) that he is disabled within the meaning of the ADA; (2) that he is qualified for the job held or

---

[43] 411 U.S. 792 (1973); s*ee Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1192 (10th Cir. 2018).

[44] 411 U.S. at 802.

[45] *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

[46] *Id.*; *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007).

[47] *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir. 1998) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995)).

desired; and (3) that he was discriminated against because of his disability."[48]  Defendant does not dispute the second element; it moves for summary judgment on the first and third elements of the prima facie case as to both discrimination claims.

### a.      Disability

Plaintiff asserts he is disabled under the ADA based on his diabetes and heart condition. Under the ADA, "[t]he term 'disability' means, with respect to an individual—(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment."[49]  The 2008 amendments to the ADA ("ADAAA") make establishing a disability easier for plaintiffs and were intended to ensure that "the definition of disability . . . [is] construed in favor of broad coverage."[50]  Plaintiff asserts he meets the definition under subsections (A) or (C)—that he is actually disabled, or regarded as such.

Under subsection (A), Plaintiff must: "(1) have a recognized impairment, (2) identify one or more appropriate major life activities, and (3) show the impairment substantially limits one or more of those activities."[51]  Whether Plaintiff can demonstrate the first two requirements are questions of law; whether he can demonstrate the third requirement "is ordinarily a question of fact for the jury."[52]

---

[48] *Aubrey v. Koppes*, 975 F.3d 995, 1014 (10th Cir. 2020) (alterations omitted) (quoting *Lincoln*, 900 F.3d at 1192).

[49] 42 U.S.C. § 12102(1).

[50] *Id.* § 12102(4)(A).

[51] *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1142 (10th Cir. 2011) (quoting *Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1216 (10th Cir. 2007)).

[52] *Sanchez v. Vilsack*, 695 F.3d 1174, 1178 (10th Cir. 2012) (quoting *Carter*, 662 F.3d at 1142).

Plaintiff maintains that his diabetes and heart condition are "physical impairments" under the statute.  "Physical impairment" is further defined by an EEOC-promulgated regulation: "Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine."[53]  Defendant does not dispute that diabetes and Plaintiff's heart condition qualify as impairments under the EEOC's definition.

As to the second requirement, Plaintiff must identify at least one "major life activity" that was affected by his impairments.[54]  Major life activities include, but are not limited to:

> (i) Caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working; and
>
> (ii) The operation of a major bodily function, including functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions. The operation of a major bodily function includes the operation of an individual organ within a body system.[55]

Plaintiff identifies "being able to do work around the home," sleep, and work as major life activities that were affected by his heart condition.[56]  Thus, Plaintiff meets the second requirement for showing an actual disability.

---

[53] 29 C.F.R. § 1630.2(h)(1).

[54] *Carter*, 662 F.3d at 1142.

[55] 29 C.F.R. § 1630.2(i)(1)(i)–(ii).

[56] Doc. 37 at 28.

Finally, the Court considers the factual question of whether or not Plaintiff's impairments "substantially limit" a major life activity, which "is not meant to be a demanding standard," and "should not demand extensive analysis."[57]  This question turns on whether an impairment "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population."[58]

Defendant argues that there is no evidence in the record that Plaintiff's diabetes or heart condition substantially limited a major life activity.  Plaintiff responds that he was limited with work around his home, had "tremendous sleeping issues due to the medication that Plaintiff had been prescribed," and that he missed work on two occasions attributable to his heart condition.[59]  The Court agrees with Defendant that there is no evidence in the record linking Plaintiff's diabetes with any limitation of his major life activities as compared to most people in the general population.  The limitation of a major life activity identified by Plaintiff—working around his home, sleeping, and working—were due to his heart condition.  The only evidence Plaintiff offers about his diabetes is his own deposition testimony where he discussed the limitations he suffered from diabetes as a child.  Plaintiff, however, testified that, as an adult, his diabetes did not restrict him at all in terms of his work and daily activities; this fact is uncontroverted.

However, there is a genuine issue of material fact as to whether Plaintiff's heart condition substantially limited a major life activity.  At the very least, a reasonable jury could conclude that the condition substantially limited his ability to sleep.  Viewing the evidence in the light most favorable to Plaintiff, he struggled to sleep for weeks after the heart episodes in late 2018, whether due to medication or otherwise.  After he was prescribed sleep medication in January

---

[57] *Id.* § 1630.2(j)(1)(i),(iii).

[58] *Id.* § 1630.2(j)(ii).

[59] Doc. 37 at 28.

2019, he recognized that he had been combative and aggressive with his coworkers, and brought the matter to Spoonemore's attention and apologized.  A reasonable jury could find that Plaintiff is disabled under the ADAAA based on his heart condition.[60]

### b.    Third Prong

The third prong of the prima facie test "focuses on whether the circumstances surrounding the adverse employment action 'give rise to an inference that the [action] was based on [the plaintiff's] disability.'"[61]   "In order to demonstrate 'discrimination,' a plaintiff generally must show that he has suffered an 'adverse employment action because of the disability.'"[62]  Additionally, courts have identified many circumstances that may lead to an inference of discrimination, including:

> [A]ctions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus . . . , preferential treatment given to employees outside the protected class . . . , in a corporate downsizing, the systematic transfer of a discharged employee's duties to other employees . . . , or a pattern of recommending the plaintiff for positions for which she is not qualified [or over-qualified] and failure to surface plaintiff's name for positions for which she is well-qualified.  A plaintiff might also rely upon the fact that the defendant, following plaintiff's termination, continued to seek applicants to fill the position, . . . or, more generally, upon the timing or sequence of events leading to plaintiff's termination.[63]

---

[60] Because Plaintiff satisfies the definition for actual disability under 29 U.S.C. § 12102(4)(A), the Court need not consider whether he was regarded as disabled under subsection (C).

[61] *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1192–93 (10th Cir. 2018) (quoting *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 544 (10th Cir. 2014)).

[62] *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1038 (10th Cir. 2011) (quoting *Mathews v. Denver Post*, 263 F.3d 1164, 1167 (10th Cir.2001)) (citations omitted); *see also Exby-Stolley v. Bd. of Cnty. Comm'rs*, 979 F.3d 784, 794 (10th Cir. 2020) (en banc).

[63] *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005) (quoting *Chertkova v. Conn. Gen. Life Ins.*, 92 F.3d 81, 91 (2d Cir.1996)).

This element of the prima facie case "requires the plaintiff to present some affirmative evidence that disability *was a determining factor* in the employer's decision."[64]

### i.    Termination

Plaintiff's first theory of discrimination is that he was terminated because of his disability.  Defendant argues that there was no adverse employment action in this case because the separation from employment was mutual, citing Plaintiff's emails and conversations with Geis and Spoonemore indicating he would find employment elsewhere if his salary demand was not met.  Second, Defendant argues that there is no evidence that Plaintiff's disability was a determining factor in his separation.

Under the Tenth Circuit's liberal definition of "adverse employment action," generally "[o]nly 'acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits' will rise to the level of an adverse employment action."[65]  "'An actual discharge . . . occurs when the employer uses language or engages in conduct that would logically lead a prudent person to believe his tenure has been terminated.' An actual discharge does not occur, however, when the employee chooses to resign rather than work under undesirable conditions."[66]

The Court finds that a genuine issue of material fact exists about whether Plaintiff was actually discharged, which would fulfill the adverse-employment-action requirement of his prima facie case.  While Plaintiff stipulates that he was unhappy with his 2019 salary increase,

---

[64] *Lincoln*, 900 F.3d at 1193 (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).

[65] *C.R. England, Inc.*, 644 F.3d at 1040 (quoting *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1222 (10th Cir.2006)).

[66] *Fischer v. Forestwood Co.*, 525 F.3d 972, 979–80 (10th Cir. 2008) (quoting *Chertkova*, 92 F.3d at 88) (citations omitted).

and the uncontroverted facts show that he repeatedly told his superiors that he would leave

Netsmart for other employment, a reasonable jury could conclude that he did not voluntarily

resign.  The only testimony referring to the end of Plaintiff's employment as a "mutual

separation" comes from Defendant's agents.  But whether Plaintiff resigned or was discharged is

judged by a reasonably-prudent-employee standard.  When viewed in the light most favorable to

Plaintiff, the summary judgment evidence shows that Plaintiff was called to a surprise meeting

on January 30, 2019, where he was terminated, after Geis made the decision to separate

immediately.  Plaintiff was not allowed to return to work.  Geis escorted him from the building

immediately following the meeting; Spoonemore boxed up his personal items.  A reasonable jury

could find that Plaintiff reasonably believed his employment was terminated at that meeting.

Next, Defendant argues that Plaintiff has not demonstrated that his disability was a

determining factor in the termination decision.  Plaintiff offers two arguments in response: (1)

Defendant's stated reason for the termination decision was false because Geis and Spoonemore

discussed whether Plaintiff needed an "accommodation," and (2) Geis' script for the termination

meeting suggests that Defendant was concerned that its stated reason for Plaintiff's termination

was insufficient since it provided alternative explanations based on how Plaintiff would respond

at the meeting.

The Court agrees with Defendant that Plaintiff's evidence is insufficient to meet his

burden of demonstrating that his disability was a determining factor in the decision to terminate.

First, as the Court already explained, Plaintiff mischaracterizes Geis' deposition testimony that

he and Spoonemore discussed whether Plaintiff needed an accommodation for his disability.

While Geis used the word "accommodate" in that testimony, the context makes clear that he was

referencing a work accommodation unrelated to Plaintiff's disability.  Specifically, Geis testified

that he was looking for an accommodation that would placate Plaintiff's demand for a higher salary and prevent him from seeking employment elsewhere.

Second, Plaintiff fails to explain how Geis' script suggests that disability was a determining factor in Defendant's decision to terminate.  Geis provided the "optional" part of the script in the event Plaintiff denied wanting to leave his employment with Defendant during the meeting.  The script does not mention Plaintiff's diabetes or heart condition, nor is it inconsistent with Defendant's stated reason for the termination.[67]  The Court finds that neither Geis' testimony about an accommodation for Plaintiff, nor his script for the termination meeting support a finding that Plaintiff's disability was the determining factor in his termination.  Thus, Plaintiff fails to establish a prima facie case of disability discrimination with regard to his termination.

### ii.      Failure to Rehire

As to the failure-to-rehire discrimination claim in Count III, Defendant argues that there is no evidence that Plaintiff's disability was a determining factor in the decisions to reject his two applications for employment in the summer of 2019.  Plaintiff responds by pointing to evidence that he was eligible for rehire, that he filed his Charge of Discrimination just prior to re-applying, that his first application "lingered for months before it was rejected,"[68] and that Spoonemore may have reviewed Plaintiff's application before it was rejected.

First, Plaintiff conflates his retaliation and discrimination claims by relying on the timing of his charge.  While the fact that he filed his charge prior to reapplying is certainly relevant to

---

[67] The Court also notes that "evidence 'tending to cast doubt on an employer's stated reasons for an employment decision' does not always satisfy the 'burden of establishing an inference of actionable discriminatory animus [at the prima facie stage].'"  *Lincoln*, 900 F.3d at 1197 (quoting *Adamson v Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1144 (10th Cir. 2008)).

[68] Doc. 37 at 33.

the question of causal connection for purposes of a retaliation claim as addressed in the next section, Plaintiff fails to explain why the mere filing of his charge prior to his reapplication is probative of discrimination.  Moreover, even if the Court assumes as true that Spoonemore was aware of Plaintiff's first reapplication, Plaintiff points to no evidence of Spoonemore's discriminatory intent prior to Plaintiff's termination, nor in choosing an internal candidate over his external application.  The mere fact that Spoonemore may have been responsible for more than one adverse employment action, standing alone, is not evidence that raises an inference of discrimination.[69]  Therefore, Plaintiff fails to come forward with evidence that his disability was a determining factor in the decisions not to rehire him in the summer 2019.  Accordingly, Plaintiff cannot establish a prima facie case of disability discrimination with regard to Defendant's failure to rehire him.

### 2. Legitimate Nondiscriminatory Reasons for Termination and Failure to Rehire

Assuming, *arguendo*, that Plaintiff could support a prima facie case of discrimination, the burden of production would shift back to Defendant to articulate facially nondiscriminatory reasons for Plaintiff's termination and its decisions not to rehire him.  Defendant asserts that it terminated Plaintiff based on Plaintiff's repeated assertions that he was looking for employment elsewhere given his access to confidential data such as medical records, and the impact his job dissatisfaction had on workplace productivity and culture.  As for its decisions not to rehire Plaintiff, Defendant states that it denied his first application because it chose an internal candidate; it denied his second application because the chosen candidate was more qualified.  Defendant has met its burden of articulating facially nondiscriminatory reasons for its decisions.

---

[69] *See Lincoln*, 900 F.3d at 1197.

### 3.     Pretext

Pretext may be shown by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."[70] Pretext can also be demonstrated by "direct evidence that the proffered rationale is false, or that the plaintiff was treated differently from similarly-situated employees."[71]  "The critical question regarding this aspect of the *McDonnell Douglas* rubric is whether 'a reasonable factfinder could rationally find [the employer's rationale] unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons.'"[72]  The Court examines "the facts as they appear *to the person making the decision*."[73]

### a.     Termination

Plaintiff claims two pieces of evidence call into question Defendant's stated reason for terminating Plaintiff: (1) Geis' conversation with Spoonemore before Plaintiff's termination about whether they must "accommodate" Plaintiff, and (2) Geis' email to Stammler with a script that includes optional talking points if he denied looking for work elsewhere.

For the same reasons discussed above, the Court does not find that Geis' deposition testimony is probative of pretext.  Viewing that testimony in the light most favorable to Plaintiff, no reasonable inference can be made that Geis was referring to a medical accommodation.  He

---

[70] *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1203 (10th Cir. 2006) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).

[71] *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1196 (10th Cir. 2011) (citing *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167–68 (10th Cir. 2007)).

[72] *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1234 (10th Cir. 2015) (alteration in original) (quoting *Crowe*, 649 F.3d at 1196).

[73] *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1166 (10th Cir. 2007) (en banc) (quoting *Watts v. City of Norman*, 270 F.3d 1288, 1295 (10th Cir. 2001)).

was clearly referring to accommodations that would placate Plaintiff's salary demand and threat to leave his employment.

Plaintiff argues that Geis' script email shows that Defendant would "fabricate any possible reason to terminate Plaintiff at that point."[74]  This email does not lead to an inference that Plaintiff's stated reason for the termination was false or fabricated.  The first part of Geis' email wholly supports Defendant's stated reason for Plaintiff's termination that, given his level of access to client information, Defendant sought to end Plaintiff's employment immediately since Plaintiff repeatedly announced his intent to accept employment elsewhere.  Geis' email then provided additional, "optional" talking points in the event Plaintiff recanted his prior statements about seeking employment elsewhere.

Plaintiff did not recant his intention to leave at the January 30, 2019 meeting, so these talking points were not necessary.  Moreover, Plaintiff fails to show how these additional talking points—that Plaintiff did not accept coaching and direction when offered in order to reach the level of progress that would justify his salary demand—undercut Defendant's stated nondiscriminatory reasons for the termination decision.  The email states that Plaintiff's "focus on effort vs. results, repeated compensation demands vs. continuous learning, and repeated declarations to discontinue employment at Netsmart serve as proxy for this mutual separation agreement."[75]  The reasons provided in these optional talking points are not inconsistent with the nondiscriminatory reason given for Plaintiff's termination.  Thus, even if Plaintiff could establish a prima facie case of discrimination based on his termination, he could not show that Defendant's stated nondiscriminatory reason for termination was a pretext for discrimination.

---

[74] Doc. 37 at 31.

[75] Doc. 38-3 at 6 (Ex. 12).

### b.    Failure to Rehire

On the failure-to-rehire discrimination claim, Plaintiff asserts that the following evidence demonstrates pretext: (1) the first position was reposted several times; and (2) Spoonemore may have reviewed his application.  As an initial matter, the Court notes that this evidence only relates to Plaintiff's first application for reemployment.  The second position was filled by a more qualified candidate and Spoonemore was not the hiring manager; thus, Plaintiff presents no evidence to support a pretextual hiring decision as to his second reemployment application.

Moreover, the cited evidence does not call into question Defendant's stated reason for its hiring decision on the first reemployment application.  The fact that the first position was reposted is not inconsistent with Defendant's assertion that it hired an internal candidate.  And there is no evidence that Spoonemore's review of Plaintiff's application led to the decision to hire an internal candidate.  In fact, Hill testified that when an internal candidate is chosen, external candidates are not even considered for the position.  Plaintiff fails to explain how the mere fact that the same decisionmaker was potentially involved in both decisions, standing alone, is probative of pretext.[76]  Thus, even if Plaintiff could establish a prima face case of discrimination based on Defendant's failure to rehire him for the first position, he could not show that Defendant's nondiscriminatory reason for the decision was pretextual.

---

[76] *See Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1197 (10th Cir. 2018) (distinguishing *Turner v. Pub. Serv. Co.*, 563 F.3d 1136, 1144 (10th Cir. 2009) because, there, "in addition to allegedly taking an adverse action against the plaintiff, [the defendant] had previously been proven to have discriminated against another individual who belonged to the same protected class as the plaintiff.").

Accordingly, the Court grants summary judgment on Plaintiff's discrimination claims in Counts I and IV.

### C.      Retaliation

In Counts III and V, Plaintiff brings separate retaliation claims based on his termination and Defendant's failure to rehire him.  The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."[77]  Because Plaintiff relies on circumstantial evidence to support his retaliation claims, they are subject to the same *McDonnell Douglas* burden-shifting framework that the Court applied to his discrimination claims.[78]

### 1.      Prima Facie Case

To establish a prima facie case of retaliation under the ADA, Plaintiff must demonstrate that (1) he engaged in protected activity under the ADA; (2) Defendant took action that an objectively reasonable employee would have found adverse; and (3) there is a causal connection between the protected activity and the adverse action.[79]  On the termination claim, Defendant argues that Plaintiff cannot demonstrate any of the requisite elements of his prima facie case.  On the failure-to-rehire claim, Defendant argues that Plaintiff fails to demonstrate the third element of his prima facie case.

---

[77] 42 U.S.C. § 12203(a).

[78] *Lincoln*, 900 F.3d at 1209.

[79] *Aubrey v. Koppes*, 975 F.3d 995, 1015 (10th Cir. 2020) (citing *Lincoln*, 900 F.3d at 1209).

### a.   Termination

Count III of the Amended Complaint alleges that Defendant terminated Plaintiff in retaliation for his request for an accommodation.  To demonstrate protected activity, Plaintiff must "show that he reasonably believed he was entitled to an accommodation under the ADA," and that Defendant knew that he was engaging in protected activity.[80]  Plaintiff asserts that Defendant was aware of Plaintiff's health condition, and points to Geis' deposition as evidence that Defendant was aware that Plaintiff requested accommodation for his disability.

To be sure, requesting an accommodation qualifies as protected activity under the ADA.[81]  But, as discussed on the failure-to-accommodate claim, there is no genuine issue of material fact about whether Plaintiff requested an accommodation.  The parties stipulated that Plaintiff never requested an accommodation with respect to his heart condition.[82]  And it is uncontroverted that Plaintiff never requested an accommodation for his diabetes.[83]  The employer's knowledge of Plaintiff's disability, standing alone, is not sufficient to demonstrate that Plaintiff engaged in protected activity.[84]  "And an inadequate request for an accommodation—one that does not trigger an employer's duty to provide a reasonable accommodation or participate in the 'interactive process' of finding an appropriate accommodation—can never constitute protected activity."[85]  Moreover, Plaintiff mischaracterizes Geis' deposition testimony, which does not refer to any request for an

---

[80] *Jones v. UPS, Inc.*, 502 F.3d 1176, 1194 (10th Cir. 2007) (citations omitted).

[81] *Aubrey*, 975 F.3d at 1015–16 (citing *Lincoln*, 900 F.3d at 1209); *Jones*, 502 F.3d at 1194 (citations omitted).

[82] Doc. 29 at 2 ¶ 7.

[83] Doc. 37 at 11 ¶ 50.

[84] *Foster v. Mountain Coal Co.*, 830 F.3d 1178, 1188 (10th Cir. 2016).

[85] *Id.* (citing *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1171 (10th Cir. 1999)).

accommodation based on Plaintiff's disability.  Therefore, Plaintiff cannot establish a prima facie

case of retaliation based on his termination because there is no evidence that he engaged in

protected activity prior to his termination.[86]

### b.    Failure to Rehire

Defendant challenges the causation element on the failure-to-rehire claim alleged in

Count V of the Amended Complaint.  A causal connection exists between the protected activity

and the materially adverse action "where the plaintiff presents evidence of circumstances that

justify an inference of retaliatory motive."[87]  The Supreme Court has clarified that a retaliation

plaintiff must show that his protected activity was the but-for cause of the alleged employment

action, and not merely a motivating factor.[88]  Under Tenth Circuit precedent, "an ADA

retaliation plaintiff may rely solely on temporal proximity to show causation during the prima

facie stage of the *McDonnell Douglas* framework where his protected activity is closely followed

by an adverse employment action."[89]  However, "[u]nless there is very close temporal proximity

between the protected activity and the retaliatory conduct, the plaintiff must offer additional

evidence to establish causation."[90]  Although temporal proximity does not require a specific

amount of time, the Tenth Circuit has found that "a period of six weeks gives rise to a rebuttable

inference of a causal connection."[91]

---

[86] Because Plaintiff cannot demonstrate the first element of his retaliation claim, the Court need not address Defendant's challenge to the remaining elements of Plaintiff's prima facie case.

[87] *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1091 (10th Cir. 2007); *Lincoln*, 900 F.3d at 1209 (quoting *Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014)).

[88] *Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013).

[89] *Foster*, 830 F.3d at 1191 (citations omitted).

[90] *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001).

[91] *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006) (citation omitted).

Plaintiff filed his charge with the EEOC alleging disability discrimination on March 19, 2019.  He first reapplied for the Solution Architect position on June 13, 2019.  He reapplied for a second Solution Architect position on August 17, 2019.  Plaintiff was declined for the first position on August 22, 2019, and for the second position on October 23, 2019.  Because more than six weeks transpired between Plaintiff's protected activity and the adverse employment actions (i.e., when Plaintiff was declined for each position), he must come forward with evidence beyond temporal proximity to show causation.

Plaintiff argues that Spoonemore's awareness of the charge, as well as the fact that Defendant reposted the position several times, indicate that Defendant was looking for additional candidates to avoid hiring Plaintiff.  As discussed on the discrimination claim, Plaintiff fails to explain how Spoonemore's knowledge of Plaintiff's first reapplication and EEOC charge evidences a retaliatory motive behind the decision not to rehire Plaintiff.  Plaintiff introduces no evidence that raises an inference of Spoonemore's retaliatory motive.  Nor does Plaintiff come forward with evidence from which a reasonable jury could infer that Defendant would have rehired him if he had not filed the charge.

Plaintiff wholly fails to address the second position for which he was declined.  That position involved a different hiring manager and there is no evidence it was reposted after Plaintiff applied. Therefore, Plaintiff is unable to demonstrate a prima facie case of retaliation based on Defendant's failure to rehire him.

### 2.   Legitimate Nondiscriminatory Reason for Termination and Failure to Rehire

Assuming, *arguendo*, that Plaintiff could support a prima facie case of retaliation, the burden of production would shift back to Defendant to articulate a facially nonretaliatory reasons for Plaintiff's termination and its decisions not to rehire him.  Defendant asserts that it terminated

Plaintiff based on Plaintiff's repeated assertions that he was looking for employment elsewhere given his access to confidential data such as medical records, and the impact his job dissatisfaction had on workplace productivity and culture.  As for its decisions not to rehire Plaintiff, Defendant states that it denied his first application because it chose an internal candidate; it denied his second application because the chosen candidate was more qualified. Defendant has met its burden of articulating facially nonretaliatory reasons for its decisions.

### 3.    Pretext

Plaintiff relies on the same evidence in support of his pretext showing on both the discrimination and retaliation claims in this case.  For the reasons already addressed in the Court's discussion of his discrimination claims, Plaintiff's evidence is insufficient to raise an inference that Defendant's stated nonretaliatory reasons for its decisions were pretextual.

Thus, the Court grants Defendant's motion for summary judgment on the retaliation claims alleged in Counts III and V.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion for Summary Judgment (Doc. 31) is **granted**.

**IT IS SO ORDERED.**

Dated: May 25, 2021

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE